UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEMETRIUS A. ADAMS,

                Plaintiff,

v.

HITT CONTRACTING, INC., et al.,

                Defendants.

Civil Action 04-1026 (HHK)

**MEMORANDUM OPINION AND ORDER**

Demetrius A. Adams, an African-American construction worker, brings this action against Hitt Contracting, Inc. ("Hitt"), and two of Hitt's subcontractors, Steele Foundations, Inc., Adams' employer, and Vertex, Inc. ("Vertex").[1] Adams asserts causes of action against each defendant for violation of his civil rights under §§ 2-1402.11 and 2-1402.31 of the District of Columbia Human Rights Act ("DCHRA") and for intentional infliction of emotional distress. Adams brings additional claims against Steele for violation of his civil rights under 42 U.S.C. § 1981, and against Hitt and Vertex for negligent supervision. Before the court are Hitt's motion to dismiss or in the alterative for summary judgment [#15] and Steele's motion to strike,[2] dismiss,

---

[1] In his original complaint, Adams names only defendants Hitt and Steele. His amended complaint adds Vertex as a defendant. Vertex has answered the amended complaint and has neither filed a dispositive motion nor joined the motions filed by Hitt and Steele.

[2] Steele moves to strike Adams' amended complaint because it was filed after Steele had filed its motion to dismiss and without Adams having obtained leave of court or Steele's consent. Steele's motion is without merit. FED. R. CIV. P. 15(a) allows a party to "amend the party's pleading once as a matter of course at any time before a responsive pleading is served or . . . by leave of court or by written consent of the adverse party . . . ." Here, Adams filed his amended complaint before a responsive pleading was filed. Steele's motion to dismiss is not a responsive pleading. *James v. Hurson Assocs., Inc.*, 229 F.3d 277, 283 (D.C. Cir. 2000)("[a] motion to dismiss is not a responsive pleading for the purposes of Rule 15"); *see also*

or in the alterative for summary judgment [#16]. Upon consideration of the motions, the oppositions thereto, and the record of this case, the court concludes that each defendant's motion must be granted in part and denied in part.

## I. FACTUAL BACKGROUND

At the time of the events pertinent to this suit, Adams worked for Steele performing sheet and shorn steel work on various construction projects. Am. Compl. ¶¶ 4, 8. Steele and Vertex, whose principal places of business are in Washington, D.C., contracted with Hitt, whose principal place of business is in Virginia, to assist with a government construction project in the District of Columbia, the South Capitol Power Plant Project. *Id.* ¶¶ 10-12.

When Vertex's employees began working on the project in October of 2003, two of them, identified only as a foreman named John and John's supervisor Sam, began making racially derogatory comments at Adams' work place. *Id.* ¶¶ 12-14. Adams initially ignored the comments. *Id.* ¶ 15. One morning following a meeting in Hitt's work trailer, John told Adams to "come over to his farm and see all the animals on the farm" and stated that "all of them were black." *Id.* ¶ 17. Adams inferred from this comment that John believed that all African-Americans were animals and that John compared him to an animal. *Id.* ¶ 18. John made these comments in front of Steele's owner, Ronald Steele, who did not take any corrective action. *Id.* ¶¶ 16-17, 19.

On another occasion in Ronald Steele's presence, John called Adams "nigger boy" and "spook," and Ronald Steele again failed to take any corrective action. *Id.* ¶¶ 20-21. On June 9,

---

*Bowden v. United States*, 176 F.3d 552, 555 (D.C. Cir. 1999) (a motion to dismiss or in the alternative for summary judgment is not considered a responsive pleading).

2004, Adams entered Hitt's main office at the project site and saw a picture of an African-American man with a noose around his neck drawn on a board. *Id.* ¶¶ 24, 26. Written below the picture was a caption that read: "To Niggerboy Tony: The next lynching will be a member of your family." *Id.* ¶ 26. Adams immediately reported the drawing to his supervisor, Ronald Steele, who did nothing about the picture, which remained on the board for three days. *Id.* ¶ 27.

On June 10, 2004, Adams followed instructions to go to the office[3] to pick up an invoice for a tool he previously repaired and found an invoice addressed to "NIGGER TONY, 31 Ghetto Blvd (first tree on the right), APE Village, DC 1 800 Colored Boy." *Id.* ¶¶ 28, 30. The customer information on the invoice read, "DAVID DUKE, 1 Nathan Bedford Blvd," and the caption on the invoice stated: "Picked mango trees and banana trees for lunch food for the fellow cotton pickers. Will distribute at the next public lynching in front of building KKK." *Id.* ¶¶ 31-32. John gave a copy of the invoice to Adams, who became distraught and contacted Ronald Steele and the Capitol Police. *Id.* ¶¶ 37-39. Adams also saw racially offensive material on a computer monitor and immediately requested that it be removed, but no one deleted the document. *Id.* ¶ 33. He then contacted Vertex's owner to view the document, and the owner jokingly requested a copy of the document.[4] *Id.* ¶¶ 34-35. Upon arriving at the scene, Capitol Police escorted several employees, including John and Sam, off the work site, questioned them, and instructed them not to return to the work site. *Id.* ¶¶ 40-41. Adams did not return to work that day. *Id.* ¶ 43. After

---

[3]  It is unclear from the complaint whether the office where Adams picked up the invoice on June 10, 2004 was Hitt's main office on the project site, where Adams allegedly saw the racist drawing on the previous day, or a different office.

[4]  Adams identifies Vertex's owner as "Sam." Am. Compl. ¶¶ 34-35, 38. It is unclear whether Adams is alleging that this is the same individual as the "Sam" referenced elsewhere in the complaint.

this incident, another employee repeatedly referred to Adams as "Tony Bologna," allegedly in reference to the fake invoice. *Id.* ¶ 90.

On June 14, 2004, Adams "had to enter a hole and cut the steel on top of the tunnel," and "every time that [Adams] came up from the tunnel," he saw Sam standing nearby, laughing. *Id.* ¶¶ 45-46. Since Sam had no reason to be in Adams' work area, Adams grew suspicious and concerned for his well-being. *Id.* Around that time, Adams met with a supervisor, Mr. Keagen, the head of the Power Plant Project, and Chuck, Mr. Keagan's assistant, to discuss the discriminatory incidents. *Id.* ¶¶ 51-52. During this meeting, Mr. Keagen and Chuck assured Adams that they would contact Hitt's main manager regarding the invoice and the drawing, and that they would fire the men responsible for the discriminatory acts. *Id.* ¶¶ 53-54.

On June 15, 2004, Adams arrived at work and saw Sam's vehicle parked in Adams's usual parking area. *Id.* ¶ 55. Adams "grew extremely suspicious" of the situation and decided to drive to another side of the construction project. *Id.* ¶¶ 55, 57. As Adams drove away from the work site, he noticed John's vehicle following him. *Id.* ¶¶ 57-59. He then contacted a police officer and spoke with Sergeant De Palma, who informed Adams that Sam and John would be required to leave the job site until further notice. *Id.* ¶ 62. When Hitt's project manager, R.J., called Adams to inquire about his whereabouts, Adams informed R.J. that he was being harassed and followed. *Id.* ¶ 66. R.J. instructed Adams to come to work and said, "Don't pay them any mind; they're just joking." *Id.* ¶ 68. Adams returned home without going to work that day, and notified Ronald Steele of the day's events. *Id.* ¶ 65.

Early in the morning on June 17, 2004, Adams heard his wife's car alarm go off, and after inspecting his vehicles, he contacted the police department about this "abnormal event." *Id.*

4

¶¶ 79-80. Upon reporting to work that day, Adams entered the tunnel to perform his day's assignment. *Id.* ¶ 84. Adams alleges that R.J. subsequently removed the ladder at the mouth of the tunnel, leaving him with no way out of the hole. *Id.* ¶¶ 84-85. Adams believes R.J. acted out of racial animus toward him. *Id.* ¶ 86. Adams and his wife also each received phone calls during the day where the caller hung up without speaking. *Id.* ¶¶ 95, 97-98.

As a consequence of the aforementioned events, Adams has been "in fear for his life," "emotionally traumatized[,] and physically a wreck." *Id.* ¶¶ 87, 91. Additionally, Adams has requested to take a leave of absence from his employment and "has been unable to sleep, eat, concentrate, cries, and is generally of poor mental health." *Id.* ¶¶ 100-01.

## II. ANALYSIS

### A. Standard of Review

A motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [5] *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). A motion to dismiss "tests not whether the plaintiff will prevail on the merits, but whether the

---

[5]  Hitt and Steele move to dismiss for failure to state a claim or for summary judgment in the alternative. "If factual matters outside the pleadings are submitted and considered by the court . . . the motion [to dismiss] must be treated as one for summary judgment under FED. R. CIV. P. 56." *Velikonja v. Mueller*, 315 F. Supp. 2d 66, 71 (D.D.C. 2004). Where the parties have already had "ample opportunity" to "present all material made pertinent to such a motion by Rule 56," the court properly considers a motion for summary judgment 'in the alternative.' *Scanwell Labs., Inc. v. Thomas*, 521 F.2d 941, 949 (D.C. Cir. 1975) (quoting FED. R. CIV. P. 12(b)). Here, however, the court has "virtually nothing to look to other than the pleadings," since to date there has been "little opportunity for discovery." *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 554-55 (2d Cir. 1977). Numerous disputed or uncertain facts require the discovery process to provide "additional sharpening of the issues." *Id.* at 554. Therefore, defendants' alternative motions for summary judgment will be denied without prejudice.

plaintiff has properly stated a claim." *Chandamuri v. Georgetown Univ.*, 274 F. Supp. 2d 71, 76 (D.D.C. 2003) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  Under the Federal Rules, a plaintiff need only provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47 (citing FED. R. CIV. P. 8(a)(2)).  In ruling on a motion to dismiss a complaint for failure to state a claim, the court must "construe the complaint in the light most favorable to [the] plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *In re United Mine Workers of Am. Employee Benefit Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994); *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993).

**B. Adams' Claims**

    **1. 42 U.S.C. § 1981**

Section 1981 provides that "[all] persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens . . . . ."  42 U.S.C. § 1981(a).  § 1981 claims "most commonly involve contracts of employment," *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 44 (D.D.C. 2003).  In order to state a claim under 42 U.S.C. § 1981, a plaintiff must show that (1) she is a member of a racial minority group; (2) "the defendant had an intent to discriminate on the basis of race"; and (3) "the discrimination concerned one or more of the activities enumerated in the statute." *Id*. at 44-45.

Here, Adams is a member of a protected class (African-American) who entered into a contractual relationship with his employer, Steele, to provide steel work for the South Power

Plant Project. Am. Compl. ¶¶ 106-07. He states that he made himself available to "obtain the benefits of employment ordinarily offered by Defendant Steele to employees outside of [his] protected class," and that he "did not enjoy the services, privileges, benefits and protections offered to persons outside of his protected class." *Id.* ¶¶ 114-15. He claims that Steele, despite being present and having knowledge of the discriminatory conduct of Hitt and Vertex's employees, failed to take corrective action regarding the discriminatory conduct. *Id.* ¶ 112. The discriminatory acts allegedly occurred at Adams' workplace, over which Steele had direct control.[6] *Id.* ¶ 111.

Adams sufficiently pleads the elements of a § 1981 claim. The court therefore denies Steele's motion to dismiss Adams' § 1981 claim.

**2. DCHRA § 2-1402.11**

Section 2-1402.11 of the DCHRA prohibits discriminatory conduct in the context of employment by an employer, labor organization, or employment agency. D.C. Code § 2-1402.11 (a)(1) – (4); *see also Jones v. District of Columbia*, 346 F. Supp. 2d 25, 40 (D.D.C. 2004). A plaintiff has a viable hostile work environment claim under DCHRA if (1) he can

---

[6] Courts resolving § 1981 actions apply the burden-shifting framework announced in *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973), and used in evaluating claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII"). *Carter v. Duncan-Huggins, Ltd.*, 727 F.2d 1225, 1232 (D.C. Cir. 1984). Steele argues that Adams fails to demonstrate that the alleged discriminatory conduct at the workplace "was sufficiently 'severe or pervasive' so as to satisfy the requirements of a claim for hostile work environment as a matter of law." Steele's Mot. to Dismiss at 12. Although a plaintiff claiming this type of race-based discrimination must eventually prove that the conduct at issue is "severe or pervasive enough to create an objectively hostile or abusive work environment," *Harris v Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993), an employment discrimination complaint does not need to contain specific facts establishing a *prima facie* case, but "instead must contain only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Swierkiewicz v. Sorema*, 534 U.S. 506, 508 (2002) (quoting FED. R. CIV. P. 8(a)(2)). Adams' amended complaint is sufficient in this regard.

demonstrate that he is a member of a protected class, (2) he has been subjected to unwelcome harassment, (3) the harassment was based on plaintiff's membership in the protected class, and (4) "the harassment is severe and pervasive enough to affect a term, condition, or privilege of employment." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 888 (D.C. 2003). In analyzing claims of employment discrimination under the DCHRA, "courts look to Title VII and its jurisprudence" for guidance. *Regan v. Grill Concepts - D.C., Inc.*, 338 F. Supp. 2d 131, 134 (D.D.C. 2004); *see also Howard Univ. v. Green*, 652 A.2d 41, 45 (D.C. 1994).

    *a. Steele*

Adams alleges that Steele intentionally discriminated against him when Steele "failed to take corrective action and permitted [his] harassers to continue to work on the worksite . . . and failed to reprimand [his] harassers." Am. Compl. ¶ 121. Steele asserts various grounds upon which the court should dismiss this claim, most conspicuously that Adams has failed to demonstrate that Steele employees were responsible for the alleged discriminatory incidents, that Steele was on notice of the tortious conduct, or that the conduct was sufficiently severe and pervasive. While Steele is correct that Adams must make these showings in order to ultimately prevail on this claim, in none of the cases Steele cites was the plaintiff's claim resolved on a motion to dismiss. Because Adams "need not plead law or match facts to every element of a legal theory" in his complaint, *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000) (quoting *Krieger v. Fadely*, 211 F.3d 134, 136 (D.C. Cir. 2000) (internal quotation omitted)), and because the complaint alleges all of the elements of a hostile work environment

claim under the DCHRA,[7] Steele's motion to dismiss Adams' § 2-1402.11 claim will be denied.

*b. Hitt*

Because DCHRA § 2-1402.11 prohibits discriminatory conduct in the context of employment by an employer, labor organization, or employment agency, the preliminary issue facing the court is whether Adams alleges that Hitt was his "employer" for purposes of DCHRA liability. Here, both parties concede that Adams is Steele's employee and that Steele is Hitt's subcontractor. Courts have determined that an independent contractor is an "employee" only if the employer retains the right to control and direct the day-to-day activities of the employee. *Wilson v. Good Humor Corp.*, 757 F.2d 1293, 1302 (D.C. Cir. 1985).

A master-servant relationship exists sufficient to create liability if an employer "has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done." *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 860 (D.C. 1982) (emphasis omitted) (citing *LeGrant v. Ins. Co. of N. Am.*, 241 A.2d 734, 735 (D.C. 1968)). In *Safeway*, the court determined that the store's security service agency was not the store's independent contractor but rather its "servant" because the store: (1) had the right to discharge the individual guards, subject to the agency's approval; (2) paid for their services on a monthly basis in a lump sum payment to the agency; and (3) enjoyed the right to control the guards' conduct. The court found specific instances of actual control as evidence of the general right of Safeway to control the guards in the performance of their duties. Thus, it determined that there was a master-servant

---

[7] In his amended complaint, Adams pleads that: (1) he is African-American, Am. Compl. ¶ 4; (2) Steele intentionally discriminated against him when it failed to take action to correct discriminatory practices at the worksite, *id.* ¶ 121; (3) the discriminatory acts were on account of his race, *id.* ¶ 116; and (4) as a result of the harassment, the "terms and conditions of his employment have been irrevocably and adversely affected." *Id.* ¶ 100.

relationship between Safeway and its guards, and held Safeway liable for a guard's allegedly tortious conduct.

Here, Adams alleges that Hitt hired Steele to "assist Hitt with a government construction project" and that Steele, Hitt and Vertex employees worked together on the same construction project. Am. Compl. ¶¶ 10, 13; Pl.'s Opp'n to Hitt's 2d Mot. to Dismiss at 13. On at least one occasion, Steele's supervisors and employees attended a work meeting in a trailer belonging to Hitt. *Id.* ¶ 16. Adams makes no allegation, however, that Hitt had the right to terminate Steele's employees, controlled and directed Steele employees' day-to-day work, or in any other way acted as Adams' employer. Consequently, the court finds that Adams' complaint does not allege any facts consistent with a finding that Hitt is his, or Steele's, employer. Because Adams does not allege that Hitt is his employer (or a labor organization or an employment agency), the court grants Hitt's motion to dismiss Adams' § 2-1402.11 claim.

**3. DCHRA § 2-1402.31**

Section 2-1402.31(a)(1) of the DCHRA states that it is an unlawful discriminatory practice to "deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations" on the basis of that person's race or color.

Hitt and Steele contend that this claim should be dismissed because the DCHRA defines "place of public accommodation" in terms of physical locations and structures and does not include "employment-related issues." Steele's 2d Mot. to Dismiss at 7; *see also* Hitt's 2d Mot. to Dismiss at 4. Invoking *James v. Team Washington, Inc.*, 1997 WL 633323, at *2 (D.D.C. Oct. 7, 1997), where the court held that a public place of accommodation was an "establishment[]

dealing with 'goods or services of any kind,'" Adams argues that a construction site is a place of public accommodation because a construction site is an establishment that provides construction services.

Adams' reasoning is flawed. The DCHRA provides specific exemptions from the definition of public accommodation, including "institution[s], club[s] or place[s] of accommodation which are in their nature distinctly private." D.C. Code § 2-1402.02. Construction sites generally bar public access, and there is no contrary indication regarding the South Capitol Power Plant Project in Adams' complaint; nor does the extensive list of places covered by this provision of the DCHRA include anything resembling a construction site.[8] The court properly dismisses a complaint under this provision of the DCHRA when the alleged discrimination did not occur in a public place. *See Carrollsburg v. Anderson*, 791 A.2d 54, 57 (D.C. 2002). As the court finds that a construction site is not a "place of public accommodation" as contemplated by the DCHRA, Hitt and Steele's motions to dismiss Adams' § 2-1402.31 claim must be granted.

**4. Negligent Supervision**

Under District of Columbia law, in order to state a claim for negligent supervision, "it is incumbent upon a party to show that an employer knew or should have known its *employee* behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with

---

[8] Under the DCHRA, a "place of public accommodation" includes places used "for the entertainment of transient guests or for the accommodation of those seeking health, recreation or rest; . . . or any place where food is sold for consumption on the premises; . . . wholesale and retail stores, . . . credit facilities . . . cleaning establishments; . . . amusement and recreation parks, . . . all public conveyances . . . ; public halls and public elevators . . . ," D.C. Code § 2-1402.02. While the list is not exhaustive, none of the cited examples are places where members of the general public are barred from entry.

that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).

Hitt claims that Adams' claim of negligent supervision must be dismissed because "[it] remains undisputed that [it] employed neither Adams nor the individuals who allegedly engaged in harassing conduct, and there are [] *no* allegations . . . showing any authority, duty, or foreknowledge on Hitt's part with respect to *any* of the alleged conduct." Hitt's 2d Mot. to Dismiss at 2. In his amended complaint, however, Adams plainly and sufficiently alleges that: (1) Hitt's employees intentionally discriminated against him, Am. Compl. ¶ 121; (2) Adams "repeatedly informed" Hitt about the discriminatory acts of its employees, *id.* ¶ 137; (3) Hitt "had actual and constructive notice" of its employees' intentional and racially discriminatory conduct toward him, *id.* ¶ 141; and (4) Hitt continued to permit the employees who discriminated against plaintiff to continue to work and to violate Adams' rights. *Id.* ¶ 143. Adams also alleges that the racially discriminatory acts were attributable to Hitt's "failure to properly supervise its employees." *Id.* ¶ 144. As the court finds that Adams sufficiently pleads the elements of a negligent supervision claim, the court will deny Hitt's motion to dismiss this claim.

**5. Intentional Infliction of Emotional Distress**

To state a claim for intentional infliction of emotional distress, a plaintiff must show: (1) extreme and outrageous conduct on the part of the defendant that (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress. *Liser v. Smith*, 254 F. Supp. 2d 89, 106 (D.D.C. 2003). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Drejza v. Vaccaro*, 650 A.2d 1308, 1312 (D.C. 1994)

(quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)).

Adams alleges that Hitt and Vertex employees intentionally discriminated against him by drawing racially offensive pictures and by making derogatory and abusive comments. Am. Compl. ¶¶ 149-50. He further states that the employees' racially derogatory remarks, drawing of a lynching, and threatening note amounted to conduct that was "so outrageous in character, extreme in degree, as to go beyond all possible bounds of decency, and would be regarded as atrocious, and utterly intolerable in a civilized society." *Id.* ¶ 160. Adams claims that both Hitt and Steele intentionally and knowingly sanctioned the allegedly discriminatory conduct by failing to take corrective action. *Id*. ¶¶ 151, 156, 158-59. Adams also alleges that both defendants' conduct caused his emotional distress, *id.* ¶ 159, namely his inability to "sleep, eat, or concentrate," *id*. ¶ 101, and his fear for [his] personal safety and the safety of [his] infant." *Id.* ¶¶ 87, 101.

The court notes that prevailing on a claim of intentional infliction of emotional distress requires meeting "a very demanding standard" which few plaintiffs manage to do. *Cooke-Seals v. District of Columbia,* 973 F. Supp. 184, 188 (D.D.C. 1997). For purposes of the pending motions, however, Adams alleges facts sufficient to support his claim for intentional infliction of emotional distress. Accordingly, the motions to dismiss this claim will be denied.[9]

---

[9] Steele also moves to dismiss Adams' claim for punitive damages. "Under District of Columbia law, punitive damages are normally available only in actions arising from intentional torts." *Calvetti v. Antcliff*, 346 F. Supp. 2d 92, 108 (D.D.C. 2004) (citing *Jemison v. Nat'l Baptist Convention, U.S.A., Inc.*, 720 A.2d 275, 285 n. 9 (D.C. 1998). Furthermore, to prevail on a claim for punitive damages arising from an intentional tort, a plaintiff must show that the act was committed "with an 'evil motive, actual malice, deliberate violence or oppression'" or otherwise establish "'outrageous conduct in willful disregard for another's rights.'" *Calvetti*, 346 F. Supp. 2d at 108 (citing *Robinson v. Sarisky*, 535 A.2d 901, 906 (D.C. 1998)). Courts have held that a plaintiff who has not demonstrated that the defendant has

### III. CONCLUSION

For the foregoing reasons, it is this 11th day of July, 2005, hereby

**ORDERED**, that Steele's motion to dismiss or in the alternative for summary judgment is **GRANTED** with respect to Adams' claim arising under DCHRA § 2-1402.31, and is otherwise **DENIED**; and it is further

**ORDERED**, that Hitt's motion to dismiss or in the alternative for summary judgment is **GRANTED** with respect to Adams' claims arising under DCHRA § 2-1402.11 and § 2-1402.31, and is otherwise **DENIED**; and it is further

**ORDERED** that defendants Hitt and Steele shall answer the complaint within 15 days of the date of this order.

                                                           Henry H. Kennedy, Jr.
                                                           United States District Judge

---

committed a willful tort has no basis for recovering punitive damages. *Id.* at 109. Because Adams has several surviving claims against Steele that allege intentional conduct, however, the court will not address the punitive damages issue at this time.