**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

DEMETRIUS A. ADAMS,

                **Plaintiff**,

                **v.**

VERTEX, INC.,

                **Defendant.**

---

**Civil Action 04-01026 (HHK)**

## MEMORANDUM OPINION

Demetrius Adams, a Black construction worker, brings this action against Defendant Vertex, Inc. ("Vertex"), alleging violations of his civil rights under the District of Columbia Human Rights Act ("DCHRA"), intentional infliction of emotional distress ("IIED"), and negligent supervision.   Before the court is Vertex's motion for summary judgment [#67].  Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion must be granted.

## I.  FACTUAL BACKGROUND

The alleged facts are as follows:  At the time of the events pertinent to this suit, Adams, a resident of Maryland, worked for Steele Foundations, Inc. ("Steele"), performing sheet and shorn steel work on various construction projects.  Am. Compl. ¶¶ 4, 8.  Vertex, whose principal place of business is in Washington, D.C., sub-contracted to assist Hitt Contracting, Inc. ("Hitt"), with a

government construction project in the District of Columbia, the South Capitol Power Plant Project ("Project").  *Id.* ¶¶ 10–12; Def's Mot. for Summ. J. ("Def.'s Mot.") at 4.  Steele also sub-contracted to work on the Project for Hitt.[1]  Am. Compl. ¶ 10.

When Vertex's employees began working on the Project in October 2003, two of them, identified only as a foreman named John and John's supervisor, Sam, began making racially derogatory comments at Adams's workplace.  *Id.* ¶¶ 12–14.  Following a meeting in Hitt's work trailer, John told Adams to "come over to his farm and see all the animals on the farm" and stated that "all of them were black."  *Id.* ¶ 17.  Adams inferred from this comment that John believed that all African-Americans were animals and that John compared him to an animal.  *Id.* ¶ 18.  On another occasion John called Adams "nigger boy" and "spook."  *Id.* ¶ 20.

On June 9, 2004, Adams entered Hitt's main office at the project site and saw a picture of a Black man with a noose around his neck drawn on a board.  *Id.* ¶¶ 24, 26.  Written below the picture was a caption that read:  "To Niggerboy Tony: The next lynching will be a member of your family."[2]  *Id.* ¶ 26.  Adams immediately reported the drawing to his supervisor, Ronald Steele, who did nothing about the picture.  *Id.* ¶ 27.

On June 10, 2004, Adams followed instructions to go to Vertex's trailer (in which two Vertex employees, Mike and Mayberry, and an employee named John from another company were present) to pick up an invoice for a tool Adams previously repaired.[3]  *Id.* ¶¶ 28–29.  There,

---

[1] Adams previously asserted causes of action against Steele and Hitt.  The parties dismissed both defendants from the suit.

[2] Adams is referred to as "Tony" throughout the record.

[3] It is not entirely clear but the summary-judgment record suggests that the office where Adams picked up the invoice on June 10  was a Vertex office.  Def. Steele's Ex. 4 at 71, 75 (Dep.

Adams found an invoice addressed to "NIGGER TONY, 31 Ghetto Blvd (first tree on the right),

APE Village, DC 1 800 Colored Boy." *Id.* ¶ 30. The customer information on the invoice read,

"DAVID DUKE, 1 Nathan Bedford Blvd," and the caption on the invoice stated: "Picked mango

trees and banana trees for lunch food for the fellow cotton pickers. *Id.* at ¶ 32. Will distribute at

the next public lynching in front of building KKK." *Id.* Simultaneously, Adams saw a depiction

of a lynching on a computer monitor. *Id.* ¶ 33. He then contacted Vertex's owner to view the

invoice, and the owner requested a copy of the document in "a malicious and joking manner."

*Id.* ¶¶ 34–35.

On June 14, 2004, Adams "had to enter a hole and cut the steel on top of the tunnel," and

"every time that [Adams] came up from the tunnel," he saw Sam standing nearby, laughing. *Id.*

¶ 45. Because Sam had no reason to be in Adams's work area, Adams grew suspicious and

concerned for his well-being. *Id.* Around the same time, Adams met with a supervisor,

Mr. Keagan, the head of the Project, and Chuck, Mr. Keagan's assistant, to discuss the

discriminatory incidents. *Id.* ¶¶ 51–52. During this meeting, Mr. Keagan and Chuck assured

Adams that they would contact Hitt's main manager regarding the invoice and the drawing, and

that they would fire the men responsible for the discriminatory acts. *Id.* ¶¶ 53–54.

On June 15, 2004, Adams arrived at work and saw Sam's vehicle parked in Adams's

usual parking area. *Id.* ¶ 55. Adams "grew extremely suspicious" of the situation and decided to

drive to another side of the construction project. *Id.* ¶¶ 55, 57. As Adams drove away from the

work site, he noticed John's vehicle following him. *Id.* ¶¶ 57–59. Adams then contacted a police

officer and spoke with Sergeant De Palma, who informed him that some Vertex employees

_____

of Adams).

would be required to leave the job site until further notice due to Adams's complaints.  *Id.* ¶ 62.

Early in the morning on June 17, 2004, Adams heard his wife's car alarm go off, and after

inspecting his vehicle, he contacted the police department about this "abnormal event."

*Id.* ¶¶ 79–80.  Adams and his wife also each received phone calls during the day only to have the

caller(s) hang up without speaking.  *Id.* ¶¶ 95, 97–98.  In addition, Adams received death threats

and his wife's tires were slashed.  Pl.'s Opp'n to Summ. J. ("Pl.'s Opp'n") at 21.  Adams later

discovered that someone had gone to the Department of Motor Vehicles to get his home address.

*Id.*  As a consequence of these events, Adams has suffered extreme anguish.  Am. Compl. ¶ 101.

## II.  ANALYSIS

Vertex moves for summary judgment on several grounds.[4]  The crux of Adams's

opposition to Vertex's motion is that Vertex may be held liable for the tortious acts of its

employees simply by virtue of its status as the employer of these persons.  The caption of a section

of the memorandum of points and authorities Adams presents states:  **"DEFENDANT VERTEX**

---

[4] According to Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.  The non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248–49.  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249–50.

**EMPLOYED THE PERSONS RESONSIBLE (**sic**) FOR HARASSING PLAINTIFF BASED ON HIS RACT (**sic**) AND IS *THUS* LIABLE FOR THE ACTIONS OF ITS EMPLOYEES.**"  Pl.'s Opp'n at 7 (emphasis supplied).  Adams goes on to argue that "[d]efendant Vertex was responsible for resolving all workplace issues involving its own employees, which would logically include any issues that Plaintiff experienced with Defendant Vertex's employees."  *Id.* at 7–8.  Adams is incorrect and cites no authority to support his argument because there is none.

An employer cannot be held liable for the wrongdoing of her employees merely because of her status as an employer.  She may be liable for the conduct of her employees, however, under certain circumstances. One such circumstance is when an employer fails to exercise reasonable care in supervising her employees.  Also, there are times when the employer may be held vicariously liable for the tortious conduct of her employees.  These possible causes of action, which are clumsily encompassed within Adams's broad-brush assertions, will be addressed in turn.

**A.      Negligent Supervision**

As noted, Vertex may be liable to Adams if it negligently supervised its employees. Vertex makes two arguments.  First, Vertex argues that Adams's negligent supervision claim must fail because it owed no duty to Adams.  According to Vertex, there existed no common law duty to protect Adams from the discriminatory conduct of its employees.  Def.'s Mot. at 14.  This argument cannot be sustained.

Vertex mischaracterizes the duty obligation pertinent to a negligent supervision claim. A party claiming "negligent supervision does not seek recovery under a theory of *respondeat superior* [because] it is an allegation of direct negligence." *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 50 (D.D.C. 2003) (citing *Brown v. Argenbright Sec., Inc.*, 782 A.2d 752, 759–60 (D.C. 2001)). An employer has a duty to use reasonable care when she hires and retains employees who come into contact with others as a direct result of their employment. *Fleming v. Bronfin*, 80 A.2d 915, 917 (D.C. 1951). If the employer breaches this duty and an employee, in the performance of a duty, injures a third party, that employer may be liable. *Id.*; *see also Phelan v. City of Mount Rainier*, 805 A.2d 930, 937 (D.C. 2002). Because Vertex's employees interacted with Adams at the worksite as a direct result of their employment, Vertex did owe a duty to Adams to use reasonable care in the supervision of its employees.

Vertex next asserts that it is entitled to summary judgment because the acts of its employees about which Adams complains were unforeseeable. Vertex points out that all of the alleged offending conduct occurred "over a period of a few days." Def.'s Mot. at 15. Essentially, Vertex's argument is that it had no actual or constructive knowledge of its employees' conduct.[5] Vertex's position on this point has merit.

Adams alleges that Vertex's owner had actual knowledge of his employees' conduct beginning on June 10, when Adams brought the racially derogatory invoice to the owner's attention. Am. Compl. ¶¶ 14–15. However, Adams fails to produce any evidence that an

---

[5] To support a claim for negligent supervision, "it is incumbent upon a party to show that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).

employee committed any harm after June 10.  The only interaction Adams claims he had with any

of the Vertex employees who allegedly discriminated against him after June 10 is that a worker

"kept coming up to [Adams] saying we need to talk, we need to talk, I need to see you."  Def.'s

Mot. at 5.  This alone, however, does not present a triable issue with respect to Vertex's

knowledge.

Consequently, the only way Vertex could held  be liable for negligent supervision is if it

had constructive knowledge of its employees' racially offensive conduct prior to the presentation

of the invoice.[6]  Adams alleges that Vertex had such constructive knowledge, but never specifies

why, how or when Vertex should have known that its employees behaved in a discriminatory

manner.  Apart from Adams's unsupported allegations, the record is devoid of evidence that

Vertex had constructive knowledge of its employees' actions toward Adams.  *See Anderson*, 477

U.S. at 249 (requiring that a non-moving plaintiff provide probative evidence in support of the

complaint to defeat summary judgment).  Adams alleges in his complaint that a Vertex employee

directed racial slurs at him on two occasions, Am. Compl. ¶¶ 17, 20, but there is no evidence to

corroborate those allegations and nothing that implicates that employee in the creation of the

invoice.  Without more, Adams's claim cannot survive because a non-moving party may not rely

on mere conclusory allegations to survive summary judgment.  *Sokos v. Hilton Hotels Corp.*, 283

F. Supp. 2d 42, 52 (D.D.C. 2003) (citing *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999)).

---

[6] In every negligence action, the plaintiff must show that the defendant's negligence was a substantial factor in causing the plaintiff's injury.  *Tarpeh-Doe v. United States*, 28 F.3d 120, 124 (D.C. Cir. 1994) ("The substantial factor test is part of the District's law of negligence.") (citation omitted).  Therefore, Vertex can only be liable for negligent supervision if its negligence occurred prior to the conduct.

Because Vertex had no actual or constructive knowledge of its employees' behavior prior to the conduct about which Adams complains, it cannot be held liable for negligently supervising them. Accordingly, the court grants summary judgment as to Adams's negligent supervision claim.

**B.     Intentional Infliction of Emotional Distress**

Even if it did not negligently supervise its employees, Vertex may be vicariously liable for their actions if the employees themselves would be liable therefor and if those actions took place within the scope of the employment relationship.  Adams contends that Vertex is vicariously liable for its employees' intentional infliction of emotional distress.  Vertex responds that summary judgment must be granted as to this claim because (1) the alleged conduct failed to rise to the level of outrageousness necessary to support the underlying claim and (2) even if the IIED claim were supported by the evidence, no liability may attach because the acts arose outside the scope of the offending employee's employment.[7]

**1.     Outrageousness of conduct**

A party making a claim for IIED must show:  "(1) extreme and outrageous conduct on the part of the defendant that (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress."  *Liser v. Smith*, 254 F. Supp. 2d 89, 106 (D.D.C. 2003) (citing *Larijani*

---

[7] Vertex also maintains that Adams did not suffer "severe emotional distress."  Def.'s Mot. at 18.  An IIED claim requires that the emotional distress proximately caused by the defendant's actions must be "of so acute a nature that harmful physical consequences might be not unlikely to result."  *Sere v. Group Hospitalization, Inc.*, 443 A.2d 33, 37 (D.C. 1982) *(*quoting *Clark v. Assoc. Retail Credit Men*, 105 F.2d 62, 65 (D.C. Cir. 1939)).  Because Adams did not see a psychiatrist or a psychologist, Vertex argues, Adams's "emotional distress was not severe."  Def.'s Mot. at 18.  A plaintiff, however, need not see a psychiatrist, psychologist, or other mental health expert in order to prove "severe emotional distress."  *See Homan v. Goyal*, 711 A.2d 812, 821 (D.C. 1998) (absence of evidence that a psychiatrist or other physician examined plaintiff does not preclude a finding of severe emotional distress).

*v. Georgetown Univ.*, 791 A.2d 41, 44 (D.C. 2002).  The conduct must be "so outrageous in

character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be

regarded as atrocious, and utterly intolerable in a civilized community." *Drejza v. Vaccaro*,

650 A.2d 1308, 1312 (D.C. 1994) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Whether conduct is "extreme or outrageous" is, in the first instance, a question of law.  *Herbin*

*v. Hoeffel*, 806 A.2d 186, 197 (D.C. 2002) (citation omitted).  "Where reasonable people could

differ, however, that issue must be submitted to the jury."  *Id.* (citation omitted).

### a.    Conduct at Issue

Although Adams alleges several instances of discriminatory conduct in his complaint, the

creation of the racially offensive invoice is the only conduct the court considers in its IIED

analysis because all other alleged conduct either fails to implicate any Vertex employee or is

unsupported by the record.[8]  As there is a genuine issue as to whether Vertex employees were

responsible for the invoice, the court will proceed to determine whether the invoice's creation and

presentation could constitute outrageous conduct.[9]

### b.    Personal confrontations in the workplace give rise to IIED claims

When deciding the type of workplace conduct that gives rise to IIED causes of action,

District of Columbia courts have distinguished between "personal, physical, and sexual"

confrontations, which are actionable, and "purely occupational" conflicts, which are not.

---

[8] Adams alleges in his complaint that Vertex employees directed racial remarks at him.
The summary-judgment record, however, is devoid of any evidence supporting these allegations.

[9] The presence of Vertex employees in Vertex's trailer at the time Adams found the
invoice and Adams's confrontation with Vertex's owner afterwards suggest Vertex employees
were responsible for the invoice's creation.

*See Kassem v. Wash. Hosp. Ctr.*, 2006 LEXIS 60302, at *9 (D.D.C. Aug. 25, 2006) (holding that a "desire to expunge a mettlesome employee and cover up regulatory infractions . . .[,] threats of discharge, revocation of [a] visa, and a conjured investigation with manufactured evidence . . . all revolve[d] around purely occupational concerns with purely occupational consequences" and did not create a cause of action); *Howard Univ. v. Best*, 484 A.2d 958, 985–86 (D.C. 1984) (deciding that personal confrontations, such as unwanted physical touching and sexual propositions by a supervisor, constituted outrageous conduct but that separate occupational conflicts, such as the supervisor's interference with job-related duties, were insufficient to support an IIED claim); *Wade v. Wash. Metro Area Transit Auth.*, 2005 LEXIS 12972, at *2–*4, *17–*18 (D.D.C. June 27, 2005) (finding outrageous conduct where a supervisor touched himself when a pregnant plaintiff touched her stomach, made disparaging sexual comments, and attempted to kiss plaintiff in the hospital after she gave birth); *see also Kerrigan v. Britches of Georgetowne*, 705 A.2d 624, 628 (D.C. 1997) (targeting employee for a sexual harassment investigation, manufacturing evidence against him, leaking information to other employees about the investigation, and unfairly demoting him was not the "type [of conduct] attributable to employer-employee conflicts" that is outrageous).

The conduct at issue here involved personal confrontations in the workplace. Nothing that Adams alleges is derivative of an occupational conflict and there were no occupational repercussions for him. Instead, the alleged activity was rooted solely in personal racial animus — the acts were prototypical actionable personal confrontations. *See Kassem*, 2006 LEXIS 60302, at *9–*10.

c.      **Racial slurs in the workplace**

Because most jurisdictions adhere to the principle that liability for IIED does not extend to

"mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,"

Restatement (Second) of Torts § 46 cmt. d, racial slurs are often considered to be non-outrageous

conduct.  *See McCray v. DPC Indus., Inc.*, 875 F. Supp. 384, 391 (E.D. Tex. 1995)

(determining that racial slurs and jokes by co-employees do not constitute outrageous conduct);

*see also Coney v. Pepsi Cola Bottling Co.*, 1997 WL 299434, at *1 (E.D. Pa. May 29, 1997)

("[H]ighly provocative racial slurs and other discriminatory treatment" do not rise to the requisite

level of outrageousness.); *Herlihy v. Metro. Museum of Art*, 633 N.Y.S.2d 106, 114 (App. Div.

1995) (Ethnic slurs as well as racial epithets are deplorable "but not so outrageous in character or

so extreme in degree as to be wholly intolerable in a civilized community.") (citation omitted);

*Briggs v. N. Shore Sanitary Dist.*, 914 F. Supp. 245, 252 (N.D. Ill. 1996) (holding that a "hanging

pickaninny doll [in a lab area shared by the Black plaintiff], her subjection to racial slurs, her

exclusion from office social activities" and various occupational disputes provide no basis for

recovery under an IIED claim); *see also* Randall Kennedy, *Nigger: Strange Career of a*

*Troublesome Word* 81–88 (2002).[10]

Vertex directs the court to a series of Florida cases in which racial insults in the workplace

were deemed insufficiently outrageous.  *See*, *e.g.*,  *Martinez v. Pavex Corp.*, 422 F. Supp. 2d

1284, 1296–97 (M.D. Fla. 2006) (directing racial slurs at a co-worker in the workplace does not

---

[10] District of Columbia courts also generally apply the "mere insults" principle to IIED
claims.  *See Rogala v. District of Columbia*, 161 F.3d 44, 58 (D.C. Cir. 1998); *see also Carter
v. Hahn*, 821 A.2d 890, 892–93 (D.C. 2003).  However, the District of Columbia Court of
Appeals has not determined whether racial slurs in the employment context fall within this
category.

rise to the requisite level of outrageousness); *Vance v. S. Bell Tel. & Tel. Co.*, 983 F.2d 1573, 1575 n.7 (11th Cir. 1993) (hanging a noose above the plaintiff's work station was insufficiently outrageous).  Other courts have held that racial slurs and epithets at the workplace can be sufficiently outrageous to give rise to an IIED claim.  *See Robinson v. Hewlett-Packard Corp.*, 183 Cal. App. 3d 1108, 1129–30 (1986) (whether a supervisor insulting an employee with racial slurs is outrageous is a triable jury issue); *see also Contreras v. Crown Zellerbach Corp.*, 565 P.2d 1173, 1177 (Wash. 1977) (en banc) (rejecting the defendant's motion to dismiss because racial insults at the workplace could constitute outrageous conduct).  In one such decision, the New Jersey Supreme Court held that when a sheriff directed a racial slur at a Black officer a material issue was created as to whether it constituted sufficiently outrageous conduct to support an IIED claim.  *Taylor v. Metzger*, 706 A.2d 685, 699 (N.J. 1998).  The court differentiated racial insults from the examples of mere insults listed in the Restatement, opining that "[r]acial insults are different qualitatively because they conjure up the entire history of racial discrimination in this country."[11]  *Id.* at 695 (quoting Richard Delgado, *Words that Wound: A Tort Action for Racial Insults, Epithets, and Name-Calling*, 17 Harv. C.R.–C.L. L. Rev. 133, 157 (1982)).

There are no District of Columbia cases determining whether personal confrontations involving racial slurs in the workplace constitute outrageous conduct.  The District of Columbia Court of Appeals has quoted with approval, however, a Washington Supreme Court case describing the evolving impropriety of the use of racial epithets:  "As we as a nation of immigrants become more aware of the need for pride in our diverse backgrounds, racial epithets

---

[11] The court described the category of mere insults as including, "You are a God damned woman and a God damned liar." *Taylor*, 706 A.2d at 695.

12

which were once part of common usage may not now be looked upon as mere insulting language."
*King v. Kidd*, 640 A.2d 656, 669 (D.C. 1993) (quoting *Contreras*, 565 P.2d at 1177) (internal
quotation marks omitted).[12]

Although there is no binding precedent in this jurisdiction regarding the outrageousness of
racial slurs and epithets, this court finds the reasoning of *Taylor* and *Contreras* persuasive in light
of the court's analysis in *King*.  The court, though, should avoid unnecessarily answering unsettled
questions of law better left to District of Columbia courts.  Therefore, the court will assume, for
purposes of this decision and without deciding the question, that racial slurs in the workplace can
constitute outrageous conduct under District of Columbia law.  In addition, the court will assume
that the evidence of outrageous conduct here is sufficient to survive summary judgment.

### 2.        Scope of Employment

Vertex contends that even if the conduct of its employees was outrageous and Adams
suffered severe emotional distress, it should not be held vicariously liable because its employees
were acting outside the scope of their employment.  The court agrees.

In the District of Columbia, employers may be held vicariously liable for the acts of their
employees committed within the scope of employment.  *Penn Cent. Transp. Co. v. Reddick*, 398
A.2d 27, 29 (D.C. 1979).  District of Columbia courts look to the Restatement to determine which
acts fall within that scope.  *Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 427–28 (D.C.
2006).  The Restatement reads:

---

[12] *King* involved, *inter alia*, an IIED claim brought by an employee against her employer
for a failure to appropriately respond to sexual harassment complaints she made against a
co-worker.  The court analogized sexual and racial harassment and also pointed out that the
standards of conduct giving rise to Title VII claims are similar to those involving IIED claims.
*King*, 640 A.2d at 669.

> Conduct of a servant is within the scope of employment, if but only if:  (a) it is of the kind he is employed to perform; (b) it occurs substantially within the authorized time and space limits; (c) it is actuated, at least in part, by a purpose to serve the master; and (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

*Id.* (quoting Restatement (Second) of Agency § 228 (1958)).  The servant's intent "is material.

[Thus, c]onduct is within the scope of employment only if the servant is actuated to some extent

by an intent to serve his master."  *Id.* (quoting Restatement (Second) of Agency § 235 cmt. a).

Courts have noted that scope-of-employment determinations are generally questions of fact best

left to juries.  *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984) (noting that whether

an employee is acting "within the scope of his employment" is a question of fact for the jury, as a

general rule).  However, "if there is not sufficient evidence from which a reasonable juror could

conclude that the action was within the scope of his employment," it becomes a question of law.

*Id.* (citations omitted).

Vertex contends that the alleged tortious conduct here fails to satisfy the first and third

prongs of the Restatement test.[13]   The court will address these prongs in turn.

---

[13] Although Vertex primarily relies on the first and third prongs of the Restatement test for its contention that its employees acted outside the scope of their employment, Vertex also maintains that its employees' actions did not occur within the authorized time and space limits. However, some, if not all, of the alleged acts, including the presentation of the invoice to Adams, occurred at the worksite during working hours.  Therefore, the second prong of the Restatement test poses no challenge to Adams's claim.  The Restatement's fourth prong, which refers to the use of force, also is inapplicable to Adams's claim.

###### a.    Direct outgrowth of authorized duties

In order for tortious acts to be of the kind an employee tortfeasor was hired to perform, the acts must be either "of the same general nature as that authorized" or "incidental to the conduct authorized."  *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995) (citation omitted) (internal quotation marks omitted).[14]  Acts that are incidental include those that are foreseeable, and "[t]o be foreseeable, the tort must be a 'direct outgrowth of the employee's instructions or job assignment.'"  *Id.* (quoting *Boykin*, 484 A.2d at 562).  An employee's acts are not a direct outgrowth of her assigned duties if those duties merely provide an opportunity for the tortious conduct to occur.  *Boykin*, 484 A.2d at 563.

Vertex primarily relies on *Boykin* for support of its argument that its employees acted outside the scope of their employment.  In *Boykin*, a blind, deaf, and mute elementary student was sexually assaulted in a cafeteria during school hours by the coordinator for blind and deaf students.  *Id.* at 561.  One of the coordinator's duties was to teach the blind children how to walk without hitting obstacles, and he sexually assaulted the plaintiff during one of these walks.  The District of Columba Court of Appeals held that the coordinator had acted outside the scope of his employment because his actions were not a direct outgrowth of his legitimate duties.  *Id.* at 564.  Rather, the coordinator's assault was related to his duties only in so far as they provided him with

---

[14] In *Osborn v. Haley*, 2007 LEXIS 1323, at \*25 (U.S. Jan. 22, 2007), the Supreme Court disagreed with the D.C. Circuit's determination in *Haddon* that, pursuant to the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("Westfall Act"), district courts should decline to adjudicate claims falling within the Act and remand them to state courts in the event the U.S. Attorney General denies certification regarding scope of office or employment. Nothing in *Osborn*, however, refutes the court's substantive scope of employment analysis under the law of the District of Columbia.

the opportunity to commit the act, and "the mere fact that an employee's employment situation

may offer an opportunity for tortious activity does not make the employer liable to the victim of

that activity." *Id.* at 563 (citation omitted).

The court in *Boykin* distinguished the facts before it from those in *Johnson v. Weinberg*,

434 A.2d 404, 409 (D.C. 1981) ("*Johnson I*"). In *Johnson I,* the court overturned a directed

verdict for the defendant employer because a reasonable jury could have found that a laundromat

worker acted within the scope of his employment when he shot a customer after a dispute over

missing shirts. Because there was no evidence suggesting the employee and the customer had met

before, the tort was not likely personal and "the assault arose out of the transaction which initially

brought the patron to the premises . . . and was triggered by a dispute over the conduct of the

employer's business." *Boykin*, 484 A.2d at 563 (quoting *Johnson I*, 434 A.2d at 409).

Some cases hold that an employee acts within the scope of employment when she harms

another co-worker at her place of employment while performing job-related activities or, at the

very least, while not neglecting her duties. In *Best*, for example, the District of Columbia Court of

Appeals rejected Howard University's claim that the school's dean acted beyond the scope of his

employment when he sexually harassed a professor during faculty, administrative and other

professional meetings they attended in their professional capacities. 484 A.2d at 987. Similarly,

in *Boyd v. O'Neill*, 273 F. Supp. 2d 92, 98–99 (D.D.C. 2003), this court accepted a plaintiff's

argument that her supervisor acted within the scope of his employment when he repeatedly

touched her shoulders, backed her up against a wall and filing cabinet and made sexually

suggestive remarks toward her at their workplace. The supervisor also physically intimidated and

verbally attacked the plaintiff. He admonished her not to tell anyone outside their branch,

16

variously referred to her probationary status, and discussed her work interactions with another employee while engaging in his tortious activities. The court found that the physical contacts and assaults were direct outgrowths of the supervisor's duties because it was within his job description to ask the plaintiff about her interactions with other employees and the status and quality of her work-product. *Id.* The touching, the court concluded, was incidental to his activities as branch chief because it occurred during normal job-related discussions. *Id.* at 99.

In this case, the requirement that the tortfeasors produce an invoice "merely provide[d] an opportunity for the tortious conduct to occur." *Boykin*, 484 A.2d at 563. The job-related duty at issue here — the creation of the invoice — provided a mere opportunity for certain employees to commit a tort, and the connection between the legitimate business of creating an invoice and the creation, instead, of a racially derogatory invoice is "too attenuated" for the tortious activity to be considered within the scope of employment. *Id.* at 562 (holding that a physical assault of a student was not closely related to the touching involved in a normal teacher-student relationship). Unlike in *Johnson I*, the activity in this case did not emerge organically out of any job-related dispute. This case is also distinguishable from *Boyd* because there, the supervisor's sexual harassment was so intertwined with other legitimate job functions that they were effectively inseparable. The scope-of-employment conclusion reached in *Best* is somewhat troublesome, but that decision contains no meaningful analysis, and, in any event, the District of Columbia Court of Appeals appears to have retreated from *Best* in its contrary decision in *Boykin*.[15]

---

[15] It is also instructive that several scope-of-employment decisions have cited to *Boykin*, while very few have cited to *Best*. *See, e.g.*, *Schecter*, 892 A.2d at 431 (relying on *Boykin's* "too attenuated" reasoning for its scope-of-employment determination); *Haddon*, 68 F.3d at 1425 (analogizing the factual situation and reasoning in *Boykin* in deciding that employee acted outside the scope of employment); *District of Columbia v. Coron*, 515 A.2d 435, 438

For the foregoing reasons, the court concludes that the creation and presentation of the offending invoice to Adams was not a direct outgrowth of the Vertex employees' legitimate duties.

###### b.      Intent to serve the master

Vertex's employees also acted outside the scope of their employment because their actions were not intended to serve Vertex.  Under this prong of the Restatement test, a tortious act, "even though it is accompanied by or motivated in part by emotions of passion, savagery or personal revenge," may subject the master to liability.  *Lyon v. Carey*, 533 F.2d 649, 654 (D.C. Cir. 1976) (deciding that whether a rape of the customer's representative by the mattress delivery person, which occurred after the two fought about payment and where the mattress would go, was committed within the scope of his employment was a jury question).  Thus, the court must determine whether the activity was conducted "solely for the accomplishment of the independent malicious or mischievous purpose of the servant."  *Reddick*, 398 A.2d at 32 (citation omitted). This "intent criterion focuses on the underlying dispute or controversy, not on the nature of the tort . . . ."  *Stokes v. Cross*, 327 F.3d 1210, 1216 (D.C. Cir. 2003) (quoting *Weinberg v. Johnson*, 581 A.2d 985, 992 (D.C. 1986) (*"Johnson II"*)).

In several cases, it is relatively easy to see how courts have inferred an intent to serve the master from the servant's actions.  *See, e.g., Hechinger v. Johnson*, 761 A.2d 15, 25 (D.C. 2000) (holding that it was reasonable to conclude that a lumber store employee acted partially with

---

(D.C. 1986) (recognizing that *Boykin* provides an important framework for scope-of-employment analyses); *but see Martin v. Potomac Elec. Power Co.*, 1989 LEXIS 15407, at *42–*43 (D.D.C. Dec. 21, 1989) (opining in dicta that *Best* suggests there is "a strong argument that an employer may be held liable for the discriminatory acts of its employees under . . . *respondeat superior* . . . if discrimination constitutes intentional infliction of emotional distress").

intent to serve the master when he struck a person he thought was stealing from the store);
*Johnson I*, 434 A.2d at 409 (recognizing that the scope of employment dispute was properly before the jury because the attacker and victim had never met before, which suggested the tort was not likely personal, and the victim approached the attacker as a result of the master's business). Here, however, the problem that affects the direct-outgrowth component of the scope-of-employment test also permeates the intent analysis. Namely, there is no indication that the torts evolved from anything legitimate. There is simply no connection between any intent to further the employer's business and the actions that resulted from the invoice's creation, and there is no evidence available from which to infer that the motivations of the employees were anything more than "independent malicious or mischievous purpose[s]." *Reddick*, 398 A.2d at 32 (citation omitted).

The production of the derogatory invoice was a deplorable act without justification. It is possible that a reasonable jury could conclude that such an act constitutes outrageous conduct sufficient to base an IIED claim. However, Vertex may not be found liable under a theory of *respondeat superior* because its employees acted outside the scope of their employment when they created it. Consequently, the court grants Vertex's summary judgment motion as to Adams's IIED claim.

**C.     DCHRA §§ 1402.11 and 1402.31**

Finally, Adams's DCHRA claims also fail. The court previously dismissed Adams's DCHRA §§ 2-1402.11 (Count II) and 2-1402.31 (Count III) claims against a number of defendants. Mem. Op. (July 11, 2005). For the reasons articulated in the court's order dismissing those claims, they are likewise dismissed as to Vertex.

19

### III.   CONCLUSION

For the foregoing reasons, the court grants Vertex's motion for summary judgment.

An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

Dated: March 29, 2007